UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CRIMINAL ACTION NO. 5:16-CR-00016-TBR

UNITED STATES OF AMERICA,                                                      PLAINTIFF

v.

JAMES EDWARD DOSS, III,                                                        DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant James Edward Doss III's Motion to Suppress. [DN 13.] The United States responded. [DN 14.] The Court held an evidentiary hearing on November 22, 2016, at which it heard testimony from Kentucky State Police Troopers Sean Wint and Jim McArthur. [DN 16.] The United States filed a post-hearing brief, [DN 19], and Doss filed a response, [DN 20.] The United States did not reply. Fully briefed, this matter is now ripe for adjudication. For the following reasons, Doss's Motion to Suppress, [DN 13], is **DENIED**.

BACKGROUND

On December 4, 2015, Troopers Sean Wint and Jim McArthur of the Kentucky State Police (KSP) conducted a "knock and talk" at Defendant James ("Jay") Doss's residence in Hopkinsville, Kentucky. [DN 16 at 10 (Evidentiary Hearing Transcript).] Prior to this encounter, Trooper Wint and Doss had lived next door to each other for approximately one year. [*Id.* at 6.] Shortly after Doss moved into the house next to Trooper Wint, Trooper Wint began receiving tips that Doss was "using and selling methamphetamines and pills next door." [*Id.* at 7.] After a few weeks of receiving this information, Trooper Wint saw Doss in his driveway and waived. [*Id.*] But rather than waiving back, as he usually did, Doss appeared startled and quickly went into his house. [*Id.*] As more time passed, Trooper Wint and the KSP narcotics task force, the

1

sheriff's department, and the local police department "continued to get tips . . . that [Doss] was doing illegal drug activity next door." [*Id.* at 8.] During a visit to his daughter's school, a teacher told Trooper Wint that they "heard [Doss] [wa]s bragging that . . . him and his buddies [we]re doing meth next door to a state trooper." [*Id.*] Additionally, Trooper Wint testified that he and his wife noticed constant traffic around Doss's house and that they could hear cars arriving and leaving and people entering and exiting Doss's house "all hours of the day or night all week long." [*Id.*] They also heard Doss "doing some type of construction stuff next door" during the day and "all through the night, into the next day, and sometimes in through the next night non-stop." [*Id.* at 8–9.]

It was the combination of these incidents that led Trooper Wint to decide to perform a knock and talk at Doss's house. [*Id.* at 10.] Shortly before 11:00 a.m. on December 4, 2015, Trooper Wint and Trooper McArthur approached Doss's front door in their full police uniforms. [*Id.*] Immediately upon knocking, the troopers heard people running inside the house. [*Id.*] After no one answered the door, they kept knocking, and Trooper Wint yelled "Jay, it's Sean, [your] next-door neighbor." [*Id.*] When Doss eventually answered the door, Trooper Wint told him "Hey, I need to talk to you for a minute." [*Id.* at 10–11.] When Doss hesitated, Trooper Wint said "Jay, it's not going to take but a minute. I do need to talk to you. It's important." [*Id.* at 11] Trooper Wint testified that at that point, Doss "stepped back out of the doorway and he let us into his home." [*Id.*] Though Trooper Wint could not recall Doss giving verbal consent, after reviewing the report he completed the next day which stated verbal consent was given, Trooper Wint testified that "[h]e would have given us verbal consent." [*Id.* at 46–47.] Moreover, Trooper McArthur testified that Doss stated "Come on. Come on in." [*Id.* at 61.]

Upon entering, the troopers asked Doss whether there were any other people in the house. [*Id.* at 12.] Doss stated that there were, and Trooper Wint yelled for them to come to the living room. [*Id.*] In response, a male and a female appeared from the hallway. Trooper Wint and Trooper McArthur asked the male and female to sit on the couch in the living room and, though Doss "didn't think" there was anyone else in the house, the troopers asked for Doss's permission to do a safety walk-through of the house. [*Id.*] Doss verbally agreed, and he and Trooper McArthur conducted the walk-through together. [*Id.* at 12; 44–45.] Meanwhile, Trooper Wint attempted to identify the male and female individuals, whom he later identified as Arthur Sivels and Alicia Reyes. [*Id.* at 12–13; 17.] ] The troopers discovered that Sivels had a warrant out for his arrest, at which point he was placed under arrest and put in handcuffs. [*Id.* at 13.] Upon searching his person, the troopers found a small bag of marijuana in his pocket. [*Id.* at 13–14.]

During the walk-through, Trooper McArthur observed a live shotgun shell in the closet and what appeared to be a gun case leaning against the closet wall. [*Id.* at 52–53.] Trooper McArthur asked Doss if the firearm was stolen, and Doss said stated that it was not and that he or his family had had the gun for a long time. [*Id.*] When Doss and Trooper McArthur returned from the walk-through, Trooper McArthur told Trooper Wint that he observed a firearm in the closet of the back bedroom of the house. [*Id.* at 13; 54.] The troopers were aware that Doss had a prior felony conviction and therefore that it was illegal for Doss to possess a firearm or ammunition. [*Id.*]

Trooper Wint asked Doss to sit down on the couch in the living room and informed him that he had received information that Doss was engaging in drug activity next door to him. [*Id.*] Trooper Wint also told Doss that he needed to pat him down and search him to verify that Doss did not have anything on him. [*Id.* at 14.] Doss got up from the couch and walked over to

3

Trooper Wint, who asked if he could search Doss's pockets, himself, and his residence. [*Id.*] Doss consented. [*Id.*] Trooper Wint testified that Doss "was extremely cooperative the whole time" and that "it was a very cordial . . . encounter." [*Id.*] Doss said something to the effect of "do whatever you need to do. I'm not going to give you any trouble." [*Id.* at 14–15.] Likewise, Trooper McArthur testified that Doss was "very cooperative" and, at times, "upset at himself." [*Id.* at 54–55.] Trooper McArthur further stated that it appeared as if Doss "was glad he got caught. He was relieved." [*Id.* at 55.]

After Trooper Wint performed the pat down and before having Doss sit back down on the couch, Trooper Wint searched the couch in the living room to verify that there were no weapons being stored there. [*Id.* at 15.] He found a small black magnetic key box and asked Doss what it was. [*Id.*] In response, Doss "took a deep breath, he sighed, and he just hung his head down." [*Id.*] Because Doss had already given Trooper Wint verbal consent to search his house, Trooper Wint opened the key box and found "two bags of a white crystal substance that appeared to be crystal methamphetamine." [*Id.*][1]

After Doss sat back on the couch, Trooper Wint read Doss his *Miranda* rights from "KSP Form 96, which is the statement of rights and waiver of those rights." [*Id.* at 15–16.] Trooper Wint testified that he does not read *Miranda* rights "from memory. [He] read[s] it directly off the paper." [*Id.* at 16.] He then had Doss read the form and sign it, which was witnessed by Trooper Wint and the female individual, Reyes. [*Id.*] The time on listed on the form is 11:05 a.m. [*Id.* at 19.] Doss "requested at some point to call his mother . . . [Trooper Wint] consented to that, said that would be fine." [*Id.* at 15.]

Trooper Wint asked Doss if there were any other firearms in the house, and Doss responded that he had another one in the back bedroom. [*Id.* at 17.] Before Trooper Wint

---

[1] Indeed, the substance later tested positive as containing methamphetamines. [DN 16 at 15.]

4

performed a more detailed search, he asked Doss to sign a "KSP Form 23, which is the consent to search" form. [*Id.* at 19.] The form provides that a person "has a right to refuse to give consent," and states that the signer "has not been threatened or coerced in any way and he's not been promised any sort of favor or benefit in return for executing the form." [*Id.* at 20.] Doss signed the form at about 11:30 a.m. [*Id.* at 19.] Trooper McArthur testified that he was present when Doss signed this form. [*Id.* at 56.]

After getting the written consent from Doss,[2] Trooper Wint and Doss went into the back bedroom and Doss, now in handcuffs, showed Trooper Wint the dresser in which the firearm was being kept. [*Id.*] Doss became very upset and started to cry at this point. [*Id.*] The drawer to the dresser was locked, so Doss got the key and unlocked it. [*Id.*] Upon opening the drawer, Trooper Wint found a 9mm handgun. [*Id.*] Trooper Wint again asked Doss if any more firearms remained in the house, and Doss responded that there were more in his safe. [*Id.*]

The safe was on the floor behind the bedroom door, and Doss gave Trooper Wint the combination to open it. [*Id.* at 17–18.] Inside the safe, Trooper Wint found a .40 caliber handgun which, when he ran the serial numbers through the Christian County Sherriff's Department, showed was stolen. [*Id.* at 18.] Also inside the safe was another black magnetic key box in which Trooper Wint again found multiple small bags of what appeared to be crystal methamphetamine.[3] [*Id.*] The safe also contained "a quantity of pills, baggies, scales, marijuana, and a lot of other . . . paraphernalia used or commonly used to traffic narcotics." [*Id.*]

After Trooper Wint's search of the dresser and the safe, he called the Hopkinsville Police Department for back up to help perform a more detailed search of the residence and to bring

---

[2] At the time of the search, Trooper Wint believed that Doss's parents were the actual owners of the house. [DN 16 at 21–22; 40.] Accordingly, he obtained verbal and written consent to search from his mother as well. [*Id.*] However, it later turned out that Doss was the actual owner of the home. [*Id.* at 40–41.]

[3] These substances also later tested positive as containing methamphetamines. [*Id.* at 18.]

evidence bags and other materials to the house. [*Id.* at 20.] After those officers arrived, they all performed a detailed search of the house and collected and bagged all of the evidence. [*Id.*]

When that search concluded, Trooper Wint took Doss in his vehicle to the Christian County Sherriff's Department. [*Id.* at 20–21.] There, Trooper Wint again read Doss his *Miranda* rights and then conducted a videotaped interview with him. [*Id.* at 25–26.] At the beginning of the interview, Trooper Wint again stated that Doss consented to the search of his home, and Doss did not disagree or argue with this statement. [*Id.* at 26–27.] During the interview, Trooper Wint asked Doss about the firearms, the methamphetamine, and the pills found in Doss's home. [*Id.* at 27.] With the exception of revealing the identity of his source of methamphetamine, Doss answered all of Trooper Wint's questions. [*Id.*] Doss's demeanor throughout the interview was "very cooperative." [*Id.*]

## STANDARD

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. If the government violates a defendant's Fourth Amendment rights, that defendant may move, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), to exclude the evidence gathered against him. *United States v. Haygood*, 549 F.3d 1049, 1053 (6th Cir. 2008). It is well-settled that, in seeking suppression, "the burden of proof is upon the defendant" to show that the search or seizure violated "some constitutional or statutory right." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)). In resolving a motion to suppress, the evidence must be viewed in the light most favorable to the Government. *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013) (citing *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011)).

DISCUSSION

A "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 854 (6th Cir. 2012) (quoting *United States v. United States Dist. Ct.,* 407 U.S. 297, 313 (1972)). Accordingly, "searches and seizures inside a home without a warrant are presumptively unreasonable," *id.* (quoting *Groh v. Ramirez,* 540 U.S. 551, 559 (2004)), and therefore "a warrantless search or seizure inside a home by a law enforcement officer violates the Fourth Amendment unless an exception to the warrant requirement applies." *Id.* (citing *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006)). For instance, the prohibition on entering a person's home "does not apply . . . to situations in which voluntary consent has been obtained . . . from the individual whose property is searched." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973)).

As Doss points out in his brief, "[i]t is the government's burden to prove that the consent was freely and voluntarily given." *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir. 1998) (citing *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968)). The government must prove this "through 'clear and positive testimony.'" *Beauchamp*, 659 F.3d at 571 (quoting *United States v. Salvo,* 133 F.3d 943, 953 (6th Cir. 1998)). "Consent is voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *Ivy*, 165 F.3d 397 at 402 (quoting *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir. 1977)). Moreover, "[t]he government is required to show something more than 'mere acquiescence' on the part of the defendant." *United States v. Holland*, 522 F. App'x 265, 274 (6th Cir. 2013) (quoting *United States v. Canipe,* 569 F.3d 597, 603 (6th Cir. 2009)). Voluntariness of consent is determined

based on the totality of the circumstances. *Ivy*, 165 F.3d 397 at 402 (citing *Bustamonte*, 412 U.S. at 227; *McCaleb*, 552 F.2d at 720).

Courts examine a multitude of factors when determining whether consent was voluntary. *Beauchamp*, 659 F.3d at 572. First, courts consider "the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *Id.* (citing *United States v. Jones,* 846 F.2d 358, 360 (6th Cir. 1988)). Although it is not a prerequisite to valid consent that law enforcement inform an individual of his or her right to refuse consent, "the absence of such a warning is considered in the totality of the circumstances analysis." *Id.* (citing *Bustamonte,* 412 U.S. at 227). Second, courts examine "the details of the detention, including the length and nature of detention, the use of coercive or punishing conduct by the police, and indications of 'more subtle forms of coercion that might flaw [an individual's] judgment.'" *Id.* (internal citations omitted) (citing *Bustamonte,* 412 U.S. at 226; quoting *United States v. Watson,* 423 U.S. 411, 424 (1976)).

Courts have found consent to be lacking, invalid, or involuntarily obtained in various circumstances. *See, e.g.*, *Beauchamp*, 659 F.3d at 572–73 (Police coercion invalidated an individual's consent where the individual was not told of his right to refuse and consented only after the officer placed his hands on the individual's body to conduct a frisk); *Turk v. Comerford*, 488 F. App'x 933, 942 (6th Cir. 2012) ("[A] reasonable factfinder could conclude that the officers' threatening jail time and pounding on the door so hard that the glass shook was coercive and therefore vitiated any consent that Turk gave."); *United States v. Tatman*, 397 F. App'x 152, 156 (6th Cir. 2010) (Signed consent form was invalidly obtained when domestic violence victim signed the form in the middle of the night, after a domestic violence incident with the defendant,

and after the defendant was placed in handcuffs and put in the back of a police car); *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (Finding lack of unequivocal consent where defendant's statement to officers that "You've got the badge, I guess you can [search]" was likely influenced by defendant's belief that refusing consent was futile, that he had no choice but to acquiesce, where defendant was not informed of his right to refuse consent, and was accosted in a busy airport crowded with people); *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992) (Lack of voluntary consent where defendant was told he was not free to leave and that if he did not consent he would have to wait two to three hours in a small, crowded room for police to obtain a search warrant).

Here, Doss contends that the government has not carried its burden of proving that, under a totality of the circumstances, "that Doss's purported consent was given voluntarily, and was unequivocal, specific, and uncontaminated by duress or coercion." [DN 20 at 5 (Doss's Post-Hearing Brief).] It appears that Doss makes two arguments as to his alleged lack of valid consent. First, Doss argues that the consent as to the troopers' initial entry was invalid. [*Id.* at 2; 5.] Second, Doss argues that the troopers' actions once inside his house invalidated any subsequent consent to search he gave. [*Id.* at 2; 6–7.] The Court will address each of these issues in turn.

1) **Consent for the Troopers' Initial Entry**

With regard to the consent for the troopers' initial entry, Doss argues that he was hesitant to allow Trooper Wint and Trooper McArthur into his house, that he was tired, had recently awoken, and that it was only after Trooper Wint told Doss that the encounter would be short that Doss "stepped back from the doorway." [*Id.* at 5.] The United States argues, in contrast, that not only did Doss step back to allow the troopers inside, but he also gave verbal consent. [DN 19 at 2 (United States' Post-Hearing Brief).] Indeed, Trooper Wint, after reviewing the report he wrote

9

the day after the entry into Doss's house, testified that Doss gave verbal consent. [DN 16 at 46–47.] Likewise, Trooper McArthur testified that Doss said "Yeah, come on in." [*Id.* at 51.]

But even assuming, for argument's sake, that Doss did only step aside rather than giving verbal consent, as the troopers testified he did, the Sixth Circuit has held multiple times that verbal consent is not a requirement. *See United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004) (The police "properly asked permission to enter, and [the defendant] stepped back, letting them in. Any ordinary caller, under like circumstances, would understand assent to have been given, and the police are not held to a higher standard in this regard than an ordinary person.") (citing *Robbins v. MacKenzie,* 364 F.2d 45, 49 (1st Cir. 1966)); *United States v. Hinojosa*, 606 F.3d 875, 882 (6th Cir. 2010) ("[T]he . . . testimony never indicates that Spears affirmatively responded to the officers' request, but there is no requirement that consent must be verbally given."); *United States v. Jackson*, 468 F. App'x 447, 453 (6th Cir. 2012) ("Jackson led the officers to his apartment . . . and without saying anything, unlocked the door, entered the apartment, looked back at the officers, and 'seemed' to hold the door open to allow them to enter. Such conduct could reasonably be interpreted as consent to their entry.") Rather, if a defendant clearly steps aside in response to an officer's request to enter, officers are permitted to interpret this act as one of assent to their entry. *See Carter*, 378 F.3d at 588.

Though Trooper Wint did testify that Doss initially hesitated before allowing the troopers inside, this initial hesitation likely "indicates . . . that [Doss] knew he had a right to refuse the [entry] and that he contemplated exercising that right." *United States v. Lucas*, 640 F.3d 168, 175 (6th Cir. 2011). The fact that Doss ultimately verbally consented or, at the very least, stepped back to allow the troopers inside, indicates that he ultimately decided against exercising this right. *See id.*; *Carter*, 378 F.3d at 588. Moreover, a careful review of the record persuades the

Court that Trooper Wint's statement to Doss that the encounter was "not going to take but a minute. I do need to talk to you. It's important," [DN 16 at 11], is not indicative of police coercion such that Doss's consent was "merely a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request." *Worley*, 193 F.3d at 386. Here, nothing about the troopers' interactions with Doss indicated that his refusal to allow them inside would be futile. The troopers did not threaten Doss or raise their voices, [DN 16 at 12; 24], pound on or kick his door, unholster their weapons, [DN 16 at 25], or claim to have a warrant or threaten to obtain one if Doss refused them entry. *See United States v. Jones,* 641 F.2d 425, 429 (6th Cir. 1981), *overruled on other grounds by Steagald v. United States,* 451 U.S. 204 (1981) (Police officers entered with guns drawn after banging and kicking the door and asserting lawful authority by stating they had a warrant); *Comerford*, 488 F. App'x at 942 ("[A] reasonable factfinder could conclude that the officers' threatening jail time and pounding on the door so hard that the glass shook was coercive and therefore vitiated any consent that Turk gave."); *Tillman*, 963 F.2d at 143 (Police told defendant he was not free to leave and that if he did not consent he would have to wait for police to obtain a search warrant).

Unlike in *Worley*, Doss was not confronted in a bustling airport surrounded by people but rather on the porch of his home. *See Lucas*, 640 F.3d at 175 (quoting *Worley*, 193 F.3d at 387) ("[T]he request for consent to search occurred in Lucas's home, as opposed to the busy airport where Worley felt pressured to cooperate with police to avoid 'an untoward scene before the crowds of people[.]'") Nor does the Court find that Doss was tricked or confused by the fact that Trooper Wint lived next door to him. To the contrary, Trooper Wint and Trooper McArthur were both dressed in their full police uniforms, [DN 16 at 11], eliminating any uncertainty as to whether Trooper Wint approached Doss's house for a friendly neighborly encounter as opposed

11

to a knock and talk by law enforcement officers. *See Carter*, 378 F.3d at 588 ("The investigating officers were instantly recognizable as policemen when Carter opened the door.") Furthermore, the record does not indicate that Doss "was unaware of his well-known right to refuse entry, which he might have done simply by standing pat, saying 'no,' or closing the door." *Id.* at 588. Doss's decision to allow the troopers inside his house "may have been rash and ill-considered, but that does not make it invalid. The Fourth Amendment does not require police officers to counsel a suspect to consider his options with care." *Id.* at 588–89.

Finally, the mere facts that Doss appeared sleepy or that he told the troopers had just awoken from sleep do not render Doss's consent involuntary or not freely given. Both troopers testified that Doss appeared to understand everything that went on during the encounter and that nothing about Doss's demeanor or actions caused them to question his ability to comprehend the situation. [DN 16 at 23–24; 57–58.] In sum, under the totality of the circumstances, the Court finds that Doss's consent to the troopers' initial entry into his home was valid.

**2) Consent for the Subsequent Searches of Doss's Home**

Doss additionally argues that, once inside his house, the troopers made strong showings of authority by requiring all individuals in the home to come out into the living room and provide their information and by arresting Sivels after determining there was a warrant out for his arrest. [DN 20 at 6.] Doss argues that, based on these actions, he "would not then believe that he had the authority to ask the troopers to leave his residence or deny their requests/commands." [*Id.*] Rather, Doss argues that a reasonable person in his position would not have known that he could terminate the encounter with police but would instead believe that police "had the authority to remain in the home and the right to perform a search." [*Id.*]

The United States argues, however, that after entering Doss's home, the troopers obtained consent from Doss before every search they performed, including the protective sweep of the

home, the pat down of Doss's person, the search of his couch, and the search of the remainder of his house. [DN 19 at 3.] Specifically, Trooper Wint and Trooper McArthur testified that, after they asked the other individuals in the house to come to the living room, they asked for Doss's permission to perform a safety sweep of the house to make sure that no other individuals remained hiding. [DN 16 at 12; 52.] They both testified that Doss consented to this safety sweep. [*Id.*] Next, Trooper Wint stated that he very specifically asked Doss "Do you care if I search your pockets, search you, and finish searching your residence?", and that Doss replied "No." [*Id.* at 14.] Trooper Wint added that Doss was "extremely cooperative the whole time . . . And he made some statement [along the lines of] 'Sean, do whatever you need to do. I'm not going to give you any trouble.'" [*Id.*]

Pursuant to the verbal consent to search the residence, Trooper Wint then searched the couch for weapons before having Doss sit back down on it. [*Id.* at 15.] Trooper Wint then stated that he read Doss his *Miranda* rights from KSP Form 96, obtained a verbal confirmation that he understood those rights, had Doss read the form himself, and then he and Reyes witnessed Doss sign the form. [*Id.* at 15–16.] After he talked to Doss for approximately twenty-five minutes, Trooper Wint then testified that, though Doss had already given him verbal consent to search the residence, before he conducted a more detailed search, he decided to obtain written consent from Doss as well. [*Id.* at 17; 19–20.] The written consent to search form, KSP Form 23, informed Doss of his right to refuse consent. [*Id.* at 20.] It further included a statement that the individual consenting to search had not been threatened, coerced, or promised any kind of favor in return for consenting to search. [*Id.*] At no time after reading this form did Doss exercise his right to refuse any further consent to search, and it was after Doss signed that form that Trooper Wint conducted the more detailed search of the house during which he found more firearms and

methamphetamine. When asked about Doss's "demeanor and attitude during this entire encounter," Trooper Wint stated that "even though [Doss] was upset and crying, the only way I could describe is it he appeared relieved that he had finally been caught. He was almost at peace with it." [DN 16 at 22.]

Based on the totality of the circumstances, the Court finds that, after the troopers entered Doss's house, he provided valid, voluntary consent for the searches they conducted. First, the Court does not find that, because the troopers asked the occupants of the house to come to the living room and provide identification or because they executed the arrest warrant on Sivels, "Doss had no way to terminate the encounter" and therefore that the multiple consents he gave, both verbal and written, were invalid and not freely given. [DN 20 at 6.] Rather, "[f]aced with the gravity of the situation and the likely course of events, [Doss] decided to cooperate with the police and actually did cooperate throughout the [day]." *See Lucas*, 640 F.3d at 175. This is evidenced by the fact that, after the troopers' interactions with Reyes and Sivels, Doss not only verbally consented to a pat down of his person and a search of his residence, [DN 16 at 14,], but proceeded to "voluntarily sign[]" both a written waiver of *Miranda* rights form and a written consent to search form about twenty-five minutes apart. *See Lucas*, 640 F.3d at 175; [*id.* at 16–20.]

It appears from the record that Doss was given an adequate opportunity to review the written forms advising him of his rights. For example, when asked about Doss's waiver of rights form, Trooper Wint testified that "I always have them read it also and then sign it after they read it." [*Id.* at 16.] The record indicates that Doss signed the consent to search form at approximately 11:30 in the morning, with only two KSP troopers there, both without any weapons drawn, voices raised, or threats of force or obtaining a warrant. *Contra United States v. Buckingham*,

14

433 F.3d 508, 514 (6th Cir. 2006) ("[I]t was late at night, numerous officers and police vehicles with flashing lights were on the scene, Buckingham may have reasonably believed that he was not free to leave the scene, and Officer Foren stated that the car would be searched regardless of whether Buckingham consented to the search."); *Tatman*, 397 F. App'x at 165 ("Taresa signed the consent form in the middle of the night, after the domestic dispute with Tatman, and just after Tatman was taken in handcuffs into the back of a police cruiser. Under these circumstances, it seems quite likely that Taresa did not even read this statement contained in the consent form, let alone intelligently consider its meaning.")

Moreover, Doss did not testify at the evidentiary hearing, and therefore the record does not contain any testimony from him claiming that he did not read or comprehend the form or that he was not aware of or did not understand his right to refuse consent to search. *See United States v. Starnes*, 501 F. App'x 379, 389 (6th Cir. 2012) ("At the suppression hearing, Kim testified that she did not read or fully understand the FBI's consent form."); *United States v. Palomino*, 100 F.3d 446, 450 (6th Cir. 1996) ("At the suppression hearing, Palomino initially admitted that he read the consent form before signing it, although he later testified that he signed the document without reading it. There is no indication that Palomino did not understand what he was signing.").

Furthermore, after signing the consent to search form, Doss provided Trooper Wint with the key to his dresser drawer, which contained a firearm, and the combination to his safe, which contained a firearm, drugs, and drug paraphernalia. [DN 16 at 17–18.] In other words, Doss "did not object to any aspect of the search after he signed the consent forms." *See Lucas*, 640 F.3d at 175. Accordingly, the Court is not persuaded that, because of the troopers' interactions with the

other occupants of his home, Doss did not understand that the encounter was a consensual one and that he had the ability to withdraw or withhold consent to the searches of his home.

Nor does the Court agree, as Doss argues, that the troopers' decision to obtain his written consent "demonstrates that they were aware that the search was constitutionally inadequate, and were attempting to fix the defect." [DN 20 at 7.] Rather, Trooper Wint testified that "*even though* [Doss] was extremely cooperative and gave [him] verbal consent, [he] went ahead and got written consent" from Doss. [DN 16 at 17 (emphasis added).] Based on this testimony, it appears that Trooper Wint was merely trying to take additional steps before performing a more detailed search of the rest of the house, rather than trying to cure what he believed was an improper prior search.

Finally, Trooper Wint testified that, when he asked Doss "What were you thinking doing all this next door to a state trooper," Doss "said something to the effect of, 'Sean, I've been waiting for you to come to that door anytime for months.' He said, 'I just got caught up.'" [DN 16 at 22.] Likewise, Trooper McArthur stated that it appeared as if Doss "was glad he got caught. He was relieved." [*Id.* at 55.] Taking all of these circumstances together, it appears that Doss simply felt that "the jig was up" and decided to cooperate with police, which he did. *See Lucas*, 640 F.3d at 175. In sum, the Court finds that the United States has established, "through 'clear and positive testimony,'" *Beauchamp*, 659 F.3d at 571, that Doss provided free and voluntary consent to each of the troopers' searches of himself and his home.[4]

---

[4] Because the Court finds that Doss provided free and voluntary consent to all of the troopers' searches, the Court need not address Doss's argument that a protective sweep was not justified. [DN 20 at 6–7.]

16

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendant James Edward Doss III's Motion to Suppress, [DN 13], is **DENIED**.

**IT IS FURTHER ORDERED** a Telephonic Further Proceedings is **SET** for **May 11, 2017 at 11:30 a.m. CDT**. The Court shall place the call to counsel.

**IT IS SO ORDERED**.

Date:

cc: Counsel of Record